People v Jones (2022 NY Slip Op 05892)

People v Jones

2022 NY Slip Op 05892

Decided on October 20, 2022

Appellate Division, Third Department

Lynch, J.P.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 20, 2022

110496 113013

[*1]The People of the State of New York, Respondent,
v
Bruce Jones, Appellant.

Calendar Date:September 8, 2022

Before: Lynch, J.P., Aarons, Reynolds Fitzgerald, Fisher and McShan, JJ.

Christopher Hammond, Cooperstown, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Philip A. Alvaro of counsel), for respondent.

Lynch, J.P.
Appeals (1) from a judgment of the County Court of Chemung County (Christopher P. Baker, J.), rendered March 5, 2018, convicting defendant upon his plea of guilty of the crime of criminal possession of a weapon in the second degree, and (2) by permission, from an order of said court (Ottavio Campanella, J.), entered July 15, 2021, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
In connection with the discovery of a loaded semi-automatic handgun during a traffic stop of a vehicle in which defendant was a passenger, defendant was charged by indictment with criminal possession of a weapon in the second degree. Defendant filed an omnibus motion seeking, among other things, suppression of certain statements made to police. Defendant later withdrew his request for a Huntley hearing in exchange for Rosario material provided by the People. Represented by new counsel, defendant ultimately pleaded guilty as charged in exchange for a prison term of six years, with 2½ years of postrelease supervision, to run concurrently with a sentence in another pending matter. He was later sentenced in accord with the plea agreement.
Defendant thereafter moved pursuant to CPL 440.10 to vacate the judgment of conviction arguing, as pertinent here, that he was deprived of the effective assistance of counsel due to the failure to seek suppression of the handgun on the ground that his constitutional rights were violated by a racially-motivated traffic stop. He also asserted a violation of his constitutional rights — separate and distinct from his ineffective assistance of counsel claim — based on the allegedly discriminatory police stop. Defendant, who is black, supported this claim with sworn affidavits from himself and the vehicle's driver. The driver — a white woman — averred in her affidavit that, during the police encounter, the investigator who initiated the stop chided her, saying "you stupid little white b****, you think this black guy cares about you, but he's just using you to run drugs." In a July 2021 order, County Court denied the motion without a hearing. Defendant appeals from the judgment of conviction and, by permission of this Court, from the July 2021 order.
As for defendant's direct appeal, his claim of ineffective assistance of counsel premised on perceived deficiencies in his attorneys' respective motion practice and discovery efforts was forfeited by his unchallenged guilty plea (see People v Darby, 206 AD3d 1165, 1169 [3d Dept 2022], lv denied 38 NY3d 1149 [2022]; People v Rutigliano, 159 AD3d 1280, 1281 [3d Dept 2018], lv denied 31 NY3d 1121 [2018]; People v Islam, 134 AD3d 1348, 1349 [3d Dept 2015]). In any event, defendant's assertion that both of his attorneys failed to act on his claim of racial profiling by moving to suppress the handgun concerns matters "appearing both in the record on direct appeal and outside of the record, . . . present[ing] a mixed but unified claim that [*2]is properly addressed in [his] CPL 440.10 motion" (People v Thacker, 173 AD3d 1360, 1361 n 2 [3d Dept 2019], lv denied 34 NY3d 938 [2019]; see People v Ballard, 200 AD3d 1476, 1479 [3d Dept 2021], lv denied 38 NY3d 925 [2022]).
Turning to that motion, defendant claims that both of his attorneys failed to adequately investigate the case as an encounter premised on racial profiling and to move to suppress the handgun recovered from the vehicle on that basis (see CPL 440.10 [1] [h]). With respect to a traffic stop, "a police officer who has probable cause to believe that a driver has committed a traffic infraction may stop a vehicle without violating either the Fourth Amendment of the US Constitution or article 1, § 12 of the NY Constitution, even if the officer's primary motivation is to conduct another investigation" (People v Blandford, 190 AD3d 1033, 1035 [3d Dept 2021], affd 37 NY3d 1062 [2021], cert denied ___ US ___, 142 S Ct 1382 [2022]; see People v Hinshaw, 35 NY3d 427, 430-437 [2020]; People v Robinson, 97 NY2d 341, 346 [2001]). As recounted in the police incident report and the grand jury testimony of the officers involved in the arrest, during the afternoon of July 7, 2017, a lieutenant with the City of Elmira Police Department was conducting stationary surveillance near a convenience store due to recent complaints of narcotics activity when he observed a vehicle pull into the store's parking lot. The lieutenant observed a black male, later identified as defendant, exit the passenger side and walk toward a residential area where the reported narcotics activity took place. The lieutenant also observed a white female exit the driver's side and enter the store. After a few minutes, the female returned to the vehicle, as did defendant. The lieutenant, in the meantime, had communicated his observations to an investigator, who was on what he described as an "impact detail" to patrol for drug activity. During that communication, the lieutenant said to the investigator, "Hey, do you want to come up in this area in the event that this leads . . . to something?" The lieutenant observed the vehicle exit the parking lot without using a turn signal and take another left turn without a turn signal, and he communicated this observation to the investigator. The investigator was, by that point, positioned behind the vehicle and effected a traffic stop.
The investigator spoke with the driver, who provided her license and explained that she was late picking up her son. The investigator then approached the passenger side and asked defendant to identify himself. When defendant inquired why the investigator needed his name, the driver pulled defendant's identification from her purse and handed it to the investigator. The investigator then had defendant exit the vehicle and conducted a pat frisk, which did not yield any contraband. The investigator explained that defendant had been observed walking in an area known for narcotics activity, to which defendant [*3]responded that he was going to his cousin's house — an address the investigator associated with drug activity. By this point, the driver was also out of the vehicle and explained that defendant walked into the neighborhood to pick up her son at a party but agreed to return once the party was over. Considering this explanation inconsistent, the investigator inquired as to whether there was "anything in the car that was illegal." The driver denied as much and refused the investigator's initial request to search the vehicle, whereupon the investigator advised that he was calling for a K-9 unit. Defendant, in turn, told the investigator that he was leaving and proceeded to do so. According to the investigator, once the driver was informed that her car would not be damaged by a search, she replied, "Well, go ahead and look then."
The investigator opened the passenger door and observed a blue backpack on the bench seat. He opened the backpack and discovered a black semi-automatic handgun. The driver explained that the gun was not hers. She later elaborated that defendant put something in the backpack as they were being pulled over. In the meantime, defendant was picked up by a patrol unit and brought to the police station. While there, the investigator asked defendant if he wanted to talk about "the stuff in the car" and defendant responded, "You want to talk about a weapon that wasn't found on me?" When the investigator pointed out that he had not mentioned a weapon, defendant requested a lawyer. A short time later, defendant acknowledged that he possessed the handgun.
Viewing this traffic stop scenario as one in which the officers were actually motivated to search for drugs, the stop would be valid under the traffic infraction standard enunciated in Robinson (see People v Robinson, 97 NY2d at 349). Defendant essentially maintains, however, that the purported drug investigation was pretextual — that is, the traffic stop here was not really premised on a drug investigation but instead motivated by the racial profiling of an interracial couple. Defendant posits in his brief that, under the Robinson standard, "it is not clear in the law whether a pretextual traffic stop is valid, and evidence seized as a result of the stop admissible as evidence, when the stop was motivated by racial profiling."
In finding that a traffic violation provides probable cause for a traffic stop, the Robinson Court explained that "neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant" (id.). In 2016, the First Department interpreted Robinson to mean that "a police stop that is motivated by discrimination or pretext may still be upheld if it is otherwise supported" by either reasonable suspicion (as was the standard being assessed in that case) or, in the case of a traffic violation, by probable cause (Patrolmen's Benevolent Assn. of the City of N.Y., Inc. v City of New York[*4], 142 AD3d 53, 66 [1st Dept 2016] [emphasis added], appeal dismissed 28 NY3d 978 [2016]). We disagree with that interpretation insofar as discrimination is concerned.
In context, the officers involved in the traffic stops discussed in Robinson were focused on robbery and other criminal activity (People v Robinson, 97 NY2d at 346-347). No claim was made in any of the three cases under review in Robinson that the officers were engaged in racial profiling (id. at 356). The Court did, however, address the "real concern . . . that police officers will use their authority to stop persons on a selective and arbitrary basis" (id. at 351). In that regard, the Court emphasized that "[d]iscriminatory law enforcement has no place in our law" (id. at 352), a sentiment echoed by this Court (see People v Price, 186 AD3d 903, 907-908 [3d Dept 2020, Lynch and Aarons, JJ., concurring]). The Court further recognized that a person detained because of his or her race would have a damages claim for a violation of the right to equal protection of the laws and freedom from unreasonable searches and seizures under the state constitution (see People v Robinson, 97 NY2d at 352-353). Consistent with that premise, and recognizing that law enforcement must be permitted to "uphold the law" (id. at 353), we conclude that the Robinson standard does not preclude a challenge to a traffic stop predicated on racial profiling, at least under our state constitution. Correspondingly, the remedy for such an unconstitutional stop would be suppression of the evidence seized. In that regard, we are mindful that the First Department reached a contrary conclusion in People v Fredericks (37 AD3d 183 [1st Dept 2007], lv denied 8 NY3d 946 [2007]), wherein the Court concluded that discriminatory law enforcement only gives rise to a civil remedy (see id. at 183; see also People v Dula, 198 AD3d 463, 465 [1st Dept 2021], lv denied 37 NY3d 1159 [2021], lv denied 37 NY3d 1162 [2021]). Such a limitation would effectively render a defendant's constitutional rights meaningless in the criminal context — an outcome we do not accept. For a defendant's constitutional rights to be meaningful, the exclusionary rule must apply (see generally People v Jones, 2 NY3d 235, 241-242 [2004]).
In reaching this conclusion, we are mindful that both the majority and dissent in Robinson rejected as unworkable the "primary motivation" subjective test for a traffic stop (see People v Robinson, 97 NY2d at 353; id. at 371 [Levine, J. dissenting]). We abide by that conclusion. Whether a traffic stop was premised on racial profiling must be assessed objectively with reference to the facts and circumstances of the encounter. Such considerations may include, for example, whether the arresting officers were involved in a plausible investigation prior to executing the vehicle stop. Also important — and certainly most relevant here — is consideration of the officers' actions and comments during the encounter.
On the record before [*5]us, such an objective analysis should be undertaken by the trial court in the first instance, as defendant demonstrated his entitlement to a hearing in connection with his CPL 440.10 motion. In that regard, CPL 440.10 (1) (h) — the provision upon which defendant relies — grants a defendant the right to move to vacate the judgment of conviction on the ground that "[t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." Where, as here, a defendant bases the motion "upon the existence or occurrence of facts, the motion papers must contain sworn allegations thereof, whether by the defendant or by another person or persons. Such sworn allegations may be based upon personal knowledge of the affiant or upon information and belief" (CPL 440.30 [1] [a]). Defendant satisfied this requirement by submitting the sworn affidavit of the driver of the vehicle, who, as discussed above, recounted a highly concerning racist statement ostensibly made by the investigator conducting the stop. Tellingly, in opposing the motion, the People neither controverted the driver's statement nor included an affidavit from the investigator doing so (see CPL 440.30 [1] [a]). Having demonstrated his right to a hearing (see CPL 440.30 [5]), defendant bears the burden of proving his claims by a preponderance of the evidence (see CPL 440.10 [1] [h]; 440.30 [6]). In resolving the motion, the court should undertake an objective analysis of the facts and circumstances of the entire police encounter.
Aarons, Reynolds Fitzgerald, Fisher and McShan, JJ., concur.
ORDERED that the judgment is affirmed.
ORDERED that the order is reversed, on the law, and matter remitted to the County Court of Chemung County for further proceedings not inconsistent with this Court's decision.